**UNITED STATES of America,
Plaintiff-Appellant,
Cross-Appellee,**

**v.**

**D.K.G. APPALOOSAS, INC., et al.,
Defendants-Appellees,**

**Bruce Emery Griffin,
Claimant-Appellee,
Cross-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**ONE 1984 LINCOLN MARK VII TWO-DOOR, One 1981 Silver Spirit Rolls Royce, et al., Defendants,**

**Bruce Emery Griffin,
Claimant-Appellant.**

**Nos. 86–2199, 86–2605.**

United States Court of Appeals,
Fifth Circuit.

Sept. 29, 1987.

**534**

Gerald H. Goldstein, San Antonio, Tex., Joseph C. Hawthorn, Beaumont, Tex., for plaintiff-appellant, cross-appellee.

Sara Criscitelli, Atty., U.S. Dept. of Justice, Washington, D.C., Bob Wortham, U.S. Atty., Beaumont, Tex., for defendants-appellees.

■

Before CLARK, Chief Judge, RANDALL, and DAVIS, Circuit Judges.

RANDALL, Circuit Judge:

The government appeals the district court's entry of judgment against the government in its suit to forfeit claimant's horse ranch in East Texas, and claimant cross-appeals the district court's allocation of the costs of operating the ranch while the forfeiture litigation was pending. In a consolidated appeal, claimant also challenges, as a violation of the *ex post facto* clause of the United States Constitution, the district court's judgment forfeiting to the government certain gold bars owned by claimant. Finally, claimant attacks the district court's refusal to give a jury charge claimant proposed in the consolidated action. We affirm the judgments entered by the district court.

I.

As the facts and proceedings below are set out in great detail in the district court's careful opinion, we recite here only those facts necessary to our disposition of this appeal. *See United States v. D.K.G. Appaloosas, Inc.*, 630 F.Supp. 1540, 1546-51 (E.D.Tex.1986) (describing as a "procedural nightmare" the attempted forfeiture of the ranch). In 1983, claimant Bruce Emery Griffin ("Griffin") pled guilty to two counts of conspiracy to possess with intent to distribute marijuana, a violation of 21 U.S.C. § 846. The plea was entered pursuant to a "pre-plea agreement" between the government and Griffin. Under the agreement, Griffin was to testify against his co-defendants and "cooperate" with the govern-ment's investigation of illegal drug trafficking activities. In return, the government agreed to stand mute at Griffin's sentencing except to inform the court of Griffin's cooperation, and to recommend that any term of imprisonment he received be concurrent with the term imposed for a separate tax conviction. Most importantly for purposes of this appeal, however, the government also agreed in the pre-plea agreement that:

> The United States will not prosecute the Defendant or otherwise seek to impose any criminal or civil sanctions against the Defendant for any act or conduct known to the United States Attorney and committed in the Southern District of Florida prior to the date of this Pre-Plea Agreement except as set out in this Agreement. Further, neither the United States nor any of its agents or employees will encourage any foreign, state, or local law enforcement authority in imposing or attempting to impose any criminal or civil sanctions or liability upon the Defendant for any acts or offense occurring prior to the date of this Agreement.

The sentencing judge, the Honorable William M. Hoeveler of the United States District Court for the Southern District of Florida, accepted the plea and sentenced Griffin to three years' imprisonment.

In March of 1984, the government filed a civil, *in rem* complaint in the United States District Court for the Eastern District of Texas, seeking forfeiture of specific real property—the D.K.G. Ranch—and a number of chattels, including a herd of horses and money in two bank accounts. The complaint alleged that the properties against which the action was brought were the proceeds of illegal drug traffic, and were therefore subject to forfeiture under 21 U.S.C. § 881. The properties were ostensibly owned by either NABUC, Ltd., a Bahamian corporation, or D.K.G. Appaloosas, Inc., a Texas corporation wholly owned by NABUC, Ltd. The government, however, suspected that Griffin, as the owner of both companies, was the true owner of the properties; nevertheless, it failed to

disclose the existence of the pre-plea agreement in its complaint. The complaint was assigned to the Honorable William M. Steger. As the presiding judge, Judge Steger found that probable cause for the seizure existed, and authorized the government to act. Within two weeks of the seizure, Griffin and others filed claims to the properties seized.

On April 23, 1984, Griffin's attorneys informally brought the existence of the pre-plea agreement to Judge Steger's attention. In August of 1984, Griffin filed an "*In camera* Motion for Specific Performance of Pre-Plea Agreement" in the United States District Court for the Southern District of Florida, seeking a declaration from Judge Hoeveler that the pre-plea agreement barred the forfeiture of the ranch. Shortly thereafter, Griffin moved in Judge Steger's Texas court to change venue of the forfeiture action to Florida.

Judge Steger reviewed the motion to transfer venue, and concluded that while the pre-plea agreement was the key to resolving the forfeiture action, the agreement itself created two separate problems. First, since the scope of the government's promise not to seek criminal or civil sanctions was unclear, the agreement had to be interpreted to determine whether it prevented the forfeiture. Second, since it was also unclear who actually owned the properties seized, the ownership issue had to be resolved before it could be determined whether the agreement even applied to those properties. With respect to the meaning of the agreement, Judge Steger, the government, and Griffin all concluded that Judge Hoeveler as the sentencing judge was in a better position to determine the parties' intent. However, the Texas court, in Judge Steger's opinion, was the proper forum for resolution of the ownership question, since that question related specifically to property located in Texas. Consequently, Judge Steger denied the motion to transfer venue. Instead, he proceeded to administer the forfeiture proceeding on the ownership issue while awaiting Judge Hoeveler's interpretation in the Florida proceeding of the scope of the agreement. As Judge Steger explained,

"Beginning in September of 1984, this Court hoped for a quick decision from Florida interpreting the plea agreement since so many other issues seemed to hinge on that one." 630 F.Supp. at 1549.

By December of 1984, however, Judge Hoeveler had still not issued a definitive interpretation of the pre-plea agreement. Concerned by the lack of real progress in the case, Judge Steger resolved to set the matter for trial. A week before the trial date, however, the government—in a motion soon joined by Griffin—moved to continue the trial until Judge Hoeveler interpreted the pre-plea agreement. Judge Steger "reluctantly agreed, and continued the matter until a date twenty-one days after the parties received a dispositive ruling from the court in Florida." *Id.* at 1549.

In August of 1985, Judge Hoeveler orally announced a provisional ruling. In the ruling, Judge Hoeveler indicated that he would specifically enforce the pre-plea agreement, and concluded that "[a]ny property owned by Bruce Emery Griffin and known to the United States Attorney at the time of the pre-plea agreement was protected from forfeiture." *Id.* at 1550. Unfortunately, no written order confirming the provisional ruling was soon forthcoming. Judge Steger, however, determined that even if Judge Hoeveler adhered to his provisional ruling when finally reducing it to writing, a trial would still be necessary to determine whether the ranch and related properties were owned by Griffin or by Griffin's companies. Moreover, a finding that the corporations owned the ranch would—in Judge Steger's view—deprive Griffin of standing to contest the forfeiture; in addition, because the pre-plea agreement only extended to Griffin individually, it would deprive the corporations of standing to assert the plea bargain. Trial on the ownership issue, therefore, was held in November of 1985. The jury returned a verdict finding that Griffin and his wife owned all of the seized property. Consequently, the scope of the plea agreement again became the critical point of the dispute. Since Judge Hoeveler still had not finalized his provisional ruling, however,

Judge Steger hesitated to enter judgment on the verdict.

On December 5, 1985, Judge Steger was notified that Judge Hoeveler had signed a final order upholding the pre-plea agreement. The order made clear that all property owned by Griffin and known to the United States Attorney at the time of the plea was protected by the pre-plea agreement. Furthermore, it specifically found that the United States Attorney had known about the ranch when the agreement was made and, therefore, that the ranch was a part of the plea agreement understanding. With respect to other properties which were seized after being found on the ranch, Judge Hoeveler's order was also clear: "If, as in the case of the ranch, the Government was aware of such property, then that property would fall in the same category and be subject to the same proscriptions as the ranch."

After learning of Judge Hoeveler's order, Judge Steger took two actions. First, Judge Steger entered judgment, based on the jury verdict and Judge Hoeveler's order, permitting Griffin to reclaim the ranch and other property—including the horses and equipment—that comprised the D.K.G. Ranch forfeiture. Judge Hoeveler's order, however, left unresolved the question of whether the government knew about certain automobiles, gold, and jewelry found on the ranch after it was seized; consequently, Judge Steger also deconsolidated the forfeiture action relating to those items and set a trial to resolve the issue of the government's knowledge. In March of 1986, a jury returned a verdict finding that the government did not know of the existence of the automobiles, gold, and jewelry at the time the plea was entered. The jury also found that the gold bars in question were purchased before 1978. Subsequently, Judge Steger entered judgment in favor of the government on the forfeiture of those items.

The government timely moved for judgment notwithstanding the verdict and for a new trial. In a comprehensive opinion and order dated February 21, 1986, Judge Steger denied the motions. 630 F.Supp. 1540.

Also in that order, Judge Steger used the court's equitable powers to apportion between Griffin and the government the costs of operating and maintaining the ranch while the forfeiture proceeding was pending. In making the apportionment, Judge Steger acknowledged that Griffin might technically be a prevailing party, but emphasized that the unique facts before him supported his decision.

On appeal, the government attacks Judge Hoeveler's interpretation of the pre-plea agreement, and argues that Judge Steger should have undertaken an independent review of the facts and theories supporting Judge Hoeveler's interpretation. Such a review, the government argues at length, clearly demonstrates that the pre-plea agreement did not and could not preclude the forfeiture action against the ranch. In response, Griffin contends that Judge Steger properly deferred to Judge Hoeveler's decision on the merits, and that this court has no jurisdiction to review a decision of a district court in the Eleventh Circuit. In the alternative, Griffin argues that Judge Hoeveler's decision was fully justified by the facts present and the applicable principles of law.

On cross-appeal, Griffin also argues that Judge Steger erred in assessing costs against a prevailing party. Next, he urges that 21 U.S.C. § 881 was not meant to be retroactive, and that the district court erred in applying it retroactively in this case to forfeit the gold bars purchased before 1978, the enactment date of the subsection under which the property was forfeited. In the alternative, Griffin argues that even if Congress intended the statute to be retroactive, the *ex post facto* clause of the United States Constitution forbids such a construction and, therefore, invalidates the forfeiture of the gold bars entered below. Finally, Griffin argues that Judge Steger erred in refusing to charge the jury that if the government knew at the time of the plea that Griffin had the funds to purchase the items sought to be forfeited, the pre-plea agreement precluded the forfeiture of those items even if the government was unaware of the specific items on which the funds were spent. We address in turn each issue raised.

## II.

### A. *The Responsibility for Interpreting the Pre-Plea Agreement*

█ The government's sole argument on appeal is that Judge Steger should have undertaken an independent review of the facts and legal theories supporting Judge Hoeveler's interpretation of the pre-plea agreement, instead of giving Judge Hoeveler's decision preclusive effect.[1] Had Judge Steger undertaken such a review, the government argues at length, he would have concluded that Judge Hoeveler's interpretation was unreasonable and, therefore, would have been compelled to permit the government to forfeit the D.K.G. Ranch and related properties. Consequently, the government concludes, Judge Steger's failure independently to examine and interpret the pre-plea agreement constitutes reversible error.

Our review of the record in this case has demonstrated that, beginning in January of 1985, the government consistently took the position that the Florida court was the proper forum for the interpretation of the pre-plea agreement. *At no point did the government ever suggest to the court below that it should disregard Judge Hoeveler's decision and independently review the basis for that judge's interpretation of the pre-plea agreement.* While isolated phrases in the government's post-trial motions may be generously read as suggesting that Judge Steger was not bound by Judge Hoeveler's decision, "the government ... never offered any argument or authority that would allow th[e] [district] court to interpret the bargain."[2] 630 F.Supp. at 1557.

This court has repeatedly stated that "[w]e will consider an issue raised for the

---

1. As part of its argument for independent review, the government makes the following sub-arguments:

(1) The United States assistant district attorney who negotiated the pre-plea agreement had no authority to bind government officials in other districts to the agreement. Therefore, the pre-plea agreement's promise that "[t]he United States will not prosecute Defendant" must be read in light of the actual, limited authority of the assistant district attorney who negotiated the agreement;

(2) In the absence of a provision in the agreement specifically forbidding the government from forfeiting the ranch and related property, the property cannot be included within the meaning of the provision forbidding the United States from bringing either civil or criminal actions against Griffin;

(3) The pre-plea agreement's promise of no civil or criminal action against Griffin does not extend to forfeiture proceedings at all, because forfeiture proceedings by their nature are directed at property rather than persons; and

(4) The property sought to be forfeited was not excluded from forfeiture by the pre-plea agreement because the property was not "known" to the government within the meaning of the agreement at the time the agreement was signed.

Since we decline the government's invitation to decide for the first time on appeal whether Judge Steger was required independently to interpret the pre-plea agreement, we also find it unnecessary to address these points which assume that analysis and interpretation of the pre-plea agreement is proper at this time.

2. As Judge Steger explained in his detailed opinion:

Ever since the claimants filed their motion to specifically enforce the agreement, both sides have concentrated their efforts in Florida. As the government quietly concedes in the present motion [for judgment notwithstanding the verdict], the arguments with regard to the plea bargain were "presented by the United States before Judge Hoeveler," and were "known to this Court." Knowledge of arguments raised in a collateral proceeding in another court does not bestow upon this Court either the duty or the right to sua sponte decide those arguments. Knowledge allowed this Court to interpret Judge Hoeveler's decision, as was done in this Court's order of September 23, 1985. It allowed nothing more.

630 F.Supp. at 1556. Our review of the record in this case leads us to the conclusion that the distinction made by Judge Steger is sound. The government, however, attempts to evade the problem by arguing that Judge Hoeveler's interpretation of the plea agreement was actually made in accordance with an "informal understanding he had reached with Judge Steger" and that, therefore, Judge Hoeveler was acting—in practical effect—as no more than a "master" for Judge Steger in the Texas forfeiture proceedings. *See* Brief for the United States at 19. Besides also being a novel argument on appeal, this characterization is not supported by the record. It is clear that at the time Griffin filed his motion with Judge Hoeveler for specific performance of the pre-plea agreement, the pre-plea agreement had yet to be formally raised in

first time on appeal only if the issue is purely a legal issue and if consideration is necessary to avoid a miscarriage of justice." *Citizens Nat'l Bank v. Taylor (In re Goff)*, 812 F.2d 931, 933 (5th Cir.1987). The issue which the government asks us to resolve, however, is not purely a legal issue. Instead, the government asks us to conduct an independent examination of the facts and circumstances around which the pre-plea agreement was negotiated, and conclude not only that Judge Steger should have made his own interpretation of the agreement, but also that his interpretation should have been the one the government argues is correct. Such a fact-specific review, however, would be difficult at best since it depends on facts the vast body of which were presented to Judge Hoeveler, but not to Judge Steger. Moreover, our review of the merits of the government's arguments have not convinced us that a miscarriage of justice would result from our failure to consider them. Consequently, we decline to consider the government's arguments on appeal.[3]

B. *The District Court's Allocation of Costs Between Griffin and the Government*

In his cross-appeal, Griffin contends that the court below abused its discretion in

taxing some sixty-five percent of the costs of operating the ranch during the forfeiture proceeding against him. Griffin argues that he prevailed on every issue concerning the forfeiture of the ranch, and urges that because he was the successful claimant, the overwhelming weight of authority supports awarding *him* costs in this action. In addition, Griffin attacks the manner in which the district court weighed the equities in the case to reach its conclusion that Griffin must bear some of the expense of maintaining the ranch. According to Griffin, the district court erred in concluding that he benefited from the government's possession and operation of the property, that the government acted in good faith in bringing the forfeiture action, and that the government's deprivation of his rightful use and enjoyment of the property was insufficient to relieve him of responsibility for the costs.

■■■ "Absent an apparent abuse of discretion we will not disturb the trial judge's assessment of costs." *McDonald v. Union Carbide Corp.*, 734 F.2d 182, 184 (5th Cir. 1984). Even assuming that Griffin qualifies as a prevailing party,[4] we find no abuse of discretion here. The Federal Rules of Civil Procedure provide that gen-

written pleadings before Judge Steger's court. *See* 630 F.Supp. at 1548. Moreover, even the "special master" scenario the government now argues requires that the issue of interpretation have been properly raised in Judge Steger's court—Judge Steger certainly could not have delegated to a special master the responsibility for interpreting the agreement unless at least one party had first asked Judge Steger to interpret the agreement. But as Judge Steger explained, not apparently without a little frustration:

Issues arising out of the in rem nature of this forfeiture were never presented to this Court. Issues concerning the scope of the authority possessed by the government's agents or the breadth of the plea agreement were presented in an untimely fashion in an improper forum. Although unlikely, these arguments may ultimately decide this case in the government's favor, yet this Court was never afforded a genuine opportunity to review them. As a practical matter, the government should have told the Court about the plea agreement issues on the night of March

13, 1984, [when the government first sought authority to seize the D.K.G. Ranch] so that some determination could have been made before the seizure. The government never gave this Court that chance. *Id.* at 1557.

3. Our manner of disposing of the government's arguments on appeal makes it unnecessary to determine whether Judge Steger was correct when he concluded that, "It was up to Judge Hoeveler to decide whether this pre-plea agreement was to be set aside, interpreted to allow forfeiture, or interpreted to bar forfeiture." 630 F.Supp. at 1549. Consequently, we do not address a judge's authority to interpret or enforce a plea agreement which was initially accepted by another judge.

4. The district court concluded that Griffin was not a prevailing party in the traditional sense of the term. "At best he is a beneficiary of a bad bargain made by the government in Florida." 630 F.Supp. at 1570. We find it unnecessary to decide the issue.

erally, "costs shall be allowed as of course to the prevailing party." Fed.R.Civ.P. 54(d). This provision creates "a strong presumption that the prevailing party will be awarded costs." *Schwarz v. Folloder,* 767 F.2d 125, 131 (5th Cir.1985) (citing *Delta Air Lines, Inc. v. August,* 450 U.S. 346, 352, 101 S.Ct. 1146, 1150, 67 L.Ed.2d 287 (1981)). The presumption, however, is not irrebutable. For example, the rule itself confers upon the district court the discretion not to award costs to a prevailing party. Fed.R.Civ.P. 54(d); *see Folloder,* 767 F.2d at 131–32 (recognizing that a court can exercise its discretion not to award costs to a prevailing party as long as the court states its reasons for refusing to permit the award). Moreover, it explicitly cautions that an award of costs against the United States can be otherwise limited by law. Fed.R.Civ.P. 54(d) ("[C]osts against the United States, its officers, and agencies shall be imposed only to the extent permitted by law."). In this case, the district court properly noted that the presumption in favor of the prevailing party is overcome by the applicability of 28 U.S.C. § 2465, an express statutory provision regulating the assessment of costs against the United States in forfeiture proceedings. 630 F.Supp. at 1571. Section 2465 provides that, if there was reasonable cause for the government's seizure of property, "the claimant shall not ... be entitled to costs." 28 U.S.C. § 2465. Griffin has conceded all along that the government had probable cause for the forfeiture. *See* 630 F.Supp. at 1547. Consequently, Griffin cannot recover costs in this case.

 There is, of course, a difference between not awarding costs to a successful claimant and requiring the claimant to bear a portion of the expenses generated from operating and maintaining, during the forfeiture proceeding, the property sought to be forfeited. The difference, however, only serves to emphasize why the allocation of expenses is so firmly committed to the trial court's discretion. The costs with which rule 54(d) of the Federal Rules of Civil Procedure and section 2465 of Title 28 are concerned are litigation costs—costs which usually would not have been incurred but for the dispute to which they are attached. In contrast, the costs which faced the district court here were the costs of maintaining the property sought to be forfeited—costs which, in the absence of seizure, might still have been incurred by the claimant. Depending on the equities of the case, some courts have taxed the costs of maintaining seized goods against the government. *See, e.g., United States v. One 1965 Chevrolet Impala Convertible,* 475 F.2d 882 (6th Cir.1973) (forcing government to bear the cost of depreciation); *United States v. One 1969 Plymouth Two-Door Hardtop,* 360 F.Supp. 488 (M.D.Ala. 1973) (requiring government to absorb costs of seizure, advertising, and storage). In some instances, however, courts have required the successful claimant to bear at least some of those costs. *See, e.g., United States v. One 1970 Buick Riviera,* 374 F.Supp. 277 (D.Minn.1973) (dividing the costs incurred in keeping a seized automobile between the government and the successful litigant). It appears to us that either decision depends, as the court below recognized, on the equities implicated by the facts of a particular case. It also appears that the district court carefully and competently weighed the equities in this case before assessing costs against Griffin.[5]

---

5. In his opinion, Judge Steger details the analytic process by which he arrived at his conclusion that costs should be apportioned between the government and Griffin. A review of the opinion demonstrates that Judge Steger was motivated by the knowledge that:

Justice requires a more careful balancing of intangible rights and other equities, of unquantified value and government maintenance. The former requires moderation in the apportionment of costs by requiring the government to bear expenses that were for the benefit of the government or the custodian. The latter compels the taxation of costs against the claimants for expenses that maintained and improved the property. In the Court's opinion, this result will adequately compensate the impairment of an intangible right while also respecting the compelling equities on the other end of the balance.

630 F.Supp. at 1570–71. The balance finally struck by Judge Steger illustrates how carefully he weighed equities. In the end, Judge Steger permitted the government to be reimbursed for

■ On the peculiar facts before us, therefore, we find that the district court did not abuse its discretion in apportioning costs between the two parties. As Judge Steger pointed out, this case is "[u]nlike so many of the reported forfeiture cases, mostly involving boats or automobiles, [in that] this case has involved the seizure of an operational, multi-million dollar Appalcosa horse ranch ... [which] the government has continued to operate ..., spending to date over two million dollars in the process." 630 F.Supp. at 1547. Consequently, "[f]rom the hundreds of thousands of dollars spent feeding his horses to the eight thousand dollars spent fixing his pool, it [is] difficult to justify huge expenditures of government funds without thinking that Bruce Emery Griffin should be required to repay some of the money even if he prevailed." *Id.* at 1568. In this irregular and unique set of circumstances, therefore, we find the district court's decision to tax "the claimants for benefits they have received and costs they would have incurred" to be a just exercise of its equitable powers. *Id.* at 1575.

## C. The Applicability of the Ex Post Facto Clause to 21 U.S.C. § 881

■ Next, Griffin appeals the district court's denial in the consolidated action of his motion for judgment n.o.v. or alternatively for a new trial. Griffin first points out that in the consolidated action, the jury found that the nine gold bars which the government was permitted to forfeit were purchased *before* 1978. However, Griffin explains, 21 U.S.C. § 881(a)(6)—the subsection under which the bars were forfeited—was not enacted *until* 1978. Since the *ex post facto* clause of the United States Constitution prohibits application of a statute in a way which imposes punishment for an act that was not punishable at the time it was committed, Griffin concludes, the *ex post facto* clause bars the forfeiture of the nine gold bars in this case.[6]

■ It is beyond dispute that the *ex post facto* clause applies only to criminal cases. *Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952); *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 400, 1 L.Ed. 648 (1798). However, the *ex post facto* effect of a law cannot be evaded by simply giving a civil form to that which is essentially criminal. *Burgess v. Salmon*, 97 U.S. (7 Otto) 381, 385, 24 L.Ed. 1104 (1878). Keying on this distinction in the nature of the proceeding, Griffin argues that although forfeiture actions "may be civil in form, [they] are in their nature criminal." *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 697, 85 S.Ct. 1246, 1249, 14 L.Ed.2d 170 (1965) (quoting *Boyd v. United States*, 116 U.S. 383, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). Consequently, Griffin explains, even if section 881 is a civil remedy, its effect is quasi-criminal and proceedings brought pursuant to the section are therefore subject to the *ex post facto* clause.

It is true that forfeiture statutes like section 881 have been considered criminal for certain purposes. *See One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965) (holding that forfeiture statute is subject to the fourth amendment's prohibitions against unreasonable searches and seizures); *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) (holding that because of its quasi-criminal nature, forfeiture proceeding was subject to the fifth amendment's prohibition against self-incrimina-

---

many of the expenses of operation and maintenance, including equipment costs and expenditures associated with the care and feeding of the horses located at the ranch. According to Judge Steger, "It is beyond doubt that the vast majority of these expenses would have been incurred regardless of who was operating the ranch." *Id.* at 1575. He refused, however, to permit reimbursement for certain expenses which, while indirectly benefitting Griffin, either more directly benefitted the government or were greater than Griffin would have incurred had he been in possession of the ranch. *Id.* at 1575–76.

**6.** Griffin also asserts that applying section 881(a)(6) to the gold bars contravenes the rule that a statute is not to be applied retroactively unless the unequivocal and inflexible import of the statute requires it to be so construed. Griffin, however, did not raise this argument before the district court, and we decline to consider it on appeal. *See Citizens Nat'l Bank*, 812 F.2d at 933.

tion). However, for other purposes, the civil nature of forfeiture proceedings has been held to bar the application of important constitutional protections. *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1983) (holding that double jeopardy clause did not apply to forfeiture proceeding before the Court); *United States v. $250,000 in United States Currency*, 808 F.2d 895 (1st Cir.1987) (holding that because of its civil nature, section 881 does not require the government to prove beyond a reasonable doubt that a criminal violation occurred); *United States v. $5,644,540.00 in United States Currency*, 799 F.2d 1357, 1364 n. 8 (9th Cir.1986) (holding that because of its civil nature, section 881 is not subject to the *ex post facto* clause); *Bramble v. Richardson*, 498 F.2d 968 (10th Cir. 1974) (holding that because of its civil nature, section 881 does not require the government to prove beyond a reasonable doubt that a criminal violation has occurred). Because determining when a forfeiture proceeding is civil or "essentially criminal" is not always readily apparent, the Supreme Court has developed a specific analysis for making the distinction.[7]

In *Helvering v. Mitchell*, the Supreme Court had to decide whether the double jeopardy clause barred a proceeding to assess an income tax deficiency, which included a fifty percent penalty, when the defendant in the proceeding had previously been acquitted under the same statute of willfully attempting to evade and defeat the tax. 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938). According to the Court, the question's resolution turned on the nature of the tax assessment proceeding: "Unless this sanction was intended as punishment, so that the proceeding is essentially criminal, the double jeopardy clause provided for the defendant in criminal prosecutions is not applicable." *Id.* at 398–99, 58 S.Ct. at 633. Moreover, to determine whether the penalty imposed in the assessment proceeding constituted a criminal sanction, was a "question ... of statutory construction." *Id.* at 399, 58 S.Ct. at 633. The need for statutory construction, the Court explained, arises because "Congress may impose both a criminal and a civil sanction in respect to the same act or omission; for the double jeopardy clause prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense." *Id.* More importantly, however, was the Court's recognition that:

> Remedial sanctions may be of varying types. One which is characteristically free of the punitive criminal element is revocation of a privilege voluntarily granted. *Forfeiture of goods or their value* and the payment of fixed or variable sums of money are other sanctions which have been recognized as enforceable by civil proceedings since the original revenue law of 1789. In spite of their comparative severity, such sanctions have been upheld against the contention that they are essentially criminal and subject to the procedural rules governing criminal prosecutions.

---

**7.** The government argues that even if section 881 is considered criminal for purposes of the *ex post facto* clause, "the penalty [imposed by section 881] existed even before 1978 in the form of criminal forfeiture under 21 U.S.C. 848, which mandated the forfeiture of profits of drug activity upon conviction of managing a continuing criminal enterprise." We decline, however, to rely on section 848, since it appears to us to be materially different from section 881. For example, before forfeiture is permitted under section 848, a person must first be convicted of engaging in a continuing criminal enterprise. *See* 21 U.S.C. § 848(a). Moreover, to "engage in a continuing criminal enterprise," (1) a person must violate a provision of the subchapter, (2) the violation must be part of a continuing series of violations of the subchapter undertaken in concert with five or more other persons, and (3) the violation must be one from which the person obtains substantial income or resources. *Id.* § 848(d). In contrast, however, section 881 permits the forfeiture of all proceeds traceable to any exchange made in violation of the subchapter as long as the Attorney General has probable cause to believe that the proceeds are subject to forfeiture. *See* 21 U.S.C. § 881(a)(6), (b)(4). The forfeiture penalty imposed by section 881, therefore, requires a lesser burden of proof than the penalty provided in section 848; consequently, we are uncomfortable relying on the latter provision to satisfy any *ex post facto* concerns which the former might raise. We therefore find it necessary to determine whether section 881 is a civil or criminal provision for purposes of the *ex post facto* clause.

*Id.* at 399–400, 58 S.Ct. at 633 (citations omitted) (emphasis added).

Nearly thirty-five years after *Helvering* was decided, the Supreme Court re-affirmed—in the context of a forfeiture proceeding—the analytic approach that the Court developed in *Helvering* for determining whether a statute is "essentially criminal." *See One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972) (per curiam) (holding that a proceeding to forfeit imported merchandise not included in a declaration was civil, not criminal, for purposes of the double jeopardy clause). Most recently, while again reaffirming *Helvering* in the context of a forfeiture proceeding, the Court explicated the manner in which the statutory construction *Helvering* requires should be undertaken. According to the Court:

Our inquiry in this regard has traditionally proceeded on two levels. First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.

*United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 362–63, 104 S.Ct. 1099, 1105, 79 L.Ed.2d 361 (1984) (quoting *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980)).

To characterize the statute under the first prong, the Court examined the legislative history of the provision, the mechanisms Congress established for enforcing forfeitures under the statute, the existence of separate criminal sanctions, and any re-medial aims furthered by the forfeiture provision. *See id.* at 363–64, 104 S.Ct. at 1105. Moreover, the Court concluded that a Congressional label of "penalty" attached to a statute is, by itself, unconvincing evidence of a criminal sanction; according to the Court, "both criminal and civil sanctions may be labeled 'penalties.'" *Id.* at 364 n. 6, 104 S.Ct. at 1106 n. 6. Consequently, the more important question is whether Congress was "cognizant of the important differences between criminal punishment and *in rem* forfeiture" when it enacted the statute. *Id.* If the first prong of the Court's test yields a designation that the statute is civil, the Court continued, "Only the clearest proof that the purpose and effect of the forfeiture are punitive will suffice to override Congress' manifest preference for a civil sanction." *Id.* at 365, 104 S.Ct. at 1106 (citations omitted). The Court then listed a number of considerations which, although neither exhaustive nor dispositive, are helpful in determining whether an act of Congress is so punitive in either purpose or effect as to negate Congress' intention that it be civil.[8]

The *Helvering* analysis and its subsequent refinements were developed in the context of determining whether a forfeiture statute is to be considered civil or criminal for purposes of the double jeopardy clause of the Constitution. However, we believe that the analysis is equally apposite to determining the nature of a statute for purposes of the *ex post facto* clause. By limiting the civil-criminal characterization to the particular forfeiture statute under consideration, the analysis avoids the problems inherent in grouping all forfeiture statutes together under a label of "quasi-criminal;" consequently, it also permits a court to both recognize and

---

**8.** The factors which the court found helpful in making the determination required by the second prong included:

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether

an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.

*One Assortment of 89 Firearms,* 465 U.S. at 365 n. 7, 104 S.Ct. at 1106 n. 7 (quoting *Kennedy v. Mendoza-Martinex,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (footnotes omitted)). The Court noted, however, that while all these factors are relevant, they may often point in differing directions. *Id.*

consider the particular idiosyncrasies of any given forfeiture provision. Equally as important, by focusing the second prong on the purpose and effect of the statute, the analysis requires a court to adjust its focus to accommodate for the particular constitutional safeguard implicated in the case before it. In this way, "the civil nature of forfeiture proceedings will not be permitted to provide an avenue through which the fundamental rights of protection against unreasonable searches and seizures and self-incrimination can be frustrated." *Bramble v. Richardson*, 498 F.2d 968, 973 (10th Cir.1974). At the same time, however, the analysis avoids transforming all forfeiture proceedings into criminal actions for every procedural purpose.

 Applying the first prong of the analysis to section 881(a)(6)—the provision under which Griffin's gold bars were forfeited—leads to the inescapable conclusion that Congress designed the section to be a remedial civil sanction. In general, the language Congress chose for section 881 evidences its intent to provide for a civil forfeiture proceeding. *See* 21 U.S.C. § 881(b)(4) ("[S]eizure without ... process may be made when ... the Attorney General has probable cause to believe that the property is subject to civil forfeiture under this subchapter."); *id.* § 881(i) ("The filing of an indictment or information alleging a violation of this subchapter ... shall, ... upon good cause shown, stay the civil forfeiture proceeding."). In addition, since Congress' intent to designate a forfeiture provision as a civil sanction can "clearly [be] demonstrated by the procedural mechanisms it established for enforcing forfeitures under the statute," *One Assortment of 89 Firearms*, 465 U.S. at 363, 104 S.Ct. at 1105, Congress must have intended section 881 to be civil. As in the forfeiture provision at issue in *One Assortment of 89 Firearms*, Congress chose not to prescribe in section 881 the steps to be followed in effectuating a forfeiture; instead, Congress incorporated by reference the procedures of forfeiture under an already existing body of civil forfeiture law—in this case, customs law. *See* 21 U.S.C. § 881(d); *see also* S.Rep. No. 225, 98th Cong., 2d Sess. 193, *reprinted in* 1984 U.S.Code Cong. & Adm.News 3182, 3376. Moreover, section 881 expressly authorizes a summary forfeiture proceeding whenever customs procedures would so permit. *Id.* "By creating such distinctly civil procedures for forfeitures ... Congress has 'indicate[d] clearly that it intended a civil, not a criminal, sanction.'" *One Assortment of 89 Firearms*, 465 U.S. at 363, 104 S.Ct. at 1105 (quoting *Helvering*, 303 U.S. at 402, 58 S.Ct. at 634).

Even more convincing, however, is the existence of 21 U.S.C. § 853—an express, criminal forfeiture provision which Congress added to Title 21 in 1984. As the Supreme Court noted in *Helvering*, the fact that the statute under consideration "contains two separate and distinct provisions imposing sanctions and that these appear in different parts of the statute, helps to make clear the character of that here invoked"—especially where one provision is "obviously a criminal one." 303 U.S. at 404–05, 58 S.Ct. at 635–36. Moreover, the legislative history of section 853 clears up any remaining doubt that section 881 was intended to provide a civil sanction. In relating the history of Title 21, Congress explained:

There are presently two types of forfeiture statutes in Federal law. The first, civil forfeiture of crime-related property through an *in rem* proceeding, has long been a part of Federal statutory law. A variety of assets used in drug violations, such as boats, cars, and manufacturing equipment, may be civilly forfeited under 21 U.S.C. § 881. Since 1978, this statute has also provided for the civil forfeiture of the proceeds of illicit drug transactions.

. . . .

The other type of forfeiture, criminal forfeiture, is relatively new to Federal law, although it has its origins in ancient English common law. It is an *in personam* proceeding against a defendant in a criminal case and is imposed as a sanction against the defendant upon his conviction. Congress first acted to provide for criminal forfeiture when it passed the

Racketeer Influenced and Corrupt Organizations statute and the Continuing Criminal Enterprise (CCE) statute. S.Rep. No. 225, 98th Cong., 2d Sess. 193, *reprinted in* 1984 U.S.Code Cong. & Adm. News 3182, 3376. Section 853 and its legislative history, therefore, clearly "evince Congressional awareness of the difference between civil and criminal forfeiture." *United States v. $39,000 in Canadian Currency*, 801 F.2d 1210, 1219 (10th Cir. 1986).

Since Congress intended section 881 to be a civil statute, we must now determine whether "the clearest proof" exists that the purpose or effect of the forfeiture is so punitive that it requires us to override Congress' preference for a civil sanction. *One Assortment of 89 Firearms*, 465 U.S. at 362–63, 364, 104 S.Ct. at 1104–05, 1105. We hold that it does not. Only two factors appear to even raise the argument that section 881 is overwhelmingly punitive. First is the legislative history to section 881(a)(6), which focuses on the "penal nature of forfeiture statutes," Joint Explanatory Statement of Titles II and III, 124 Cong.Rec. S17647 (daily ed. Oct. 7, 1978), *reprinted in* 1978 U.S.Code Cong. & Adm. News 9496, 9518, 9522–23; second is one of the factors designated as "helpful" by the Court in *One Assortment of 89 Firearms* —the fact that the actions which give rise to forfeiture proceedings under section 881 may themselves entail criminal penalties. Both of these factors, however, are less than compelling.

It is, of course, true that "Congress may impose both a criminal and a civil sanction in respect to the same act or omission." *Helvering*, 303 U.S. at 399, 58 S.Ct. at 633. Therefore, the fact that Congress may have done so to some extent here does not necessitate a finding that both sanctions must be considered criminal—especially where the "civil" sanction covers a broader range of conduct than is proscribed by the "criminal" sanction. *See One Assortment of 89 Firearms*, 465 U.S. at 363–64, 104 S.Ct. at 1105; *compare* 21 U.S.C. § 881 (requiring only a showing of probable cause to believe that the property is the proceed of an illegal exchange) *and* 21

U.S.C. § 853 (requiring a conviction before permitting proceeds which resulted from an illegal exchange to be forfeited). Moreover, because all "sanctions" are necessarily "penal" to some degree, it is more important to determine whether the sanction serves *primarily* a penal purpose than it is to determine whether it serves *at least* a penal purpose. The legislative history to section 853 makes it clear, however, that the forfeiture provisions of Title 21 have a strong, remedial aim. As Congress explained:

More than ten years ago, the Congress recognized in its enactment of statutes specifically addressing organized crime and illegal drugs that the conviction of individual racketeers and drug dealers would be of only limited effectiveness if the economic power bases of criminal organizations or enterprises were left intact, and so included forfeiture authority designed to strip these offenders and organizations of their economic power.... Clearly, if law enforcement efforts to combat racketeering and drug trafficking are to be successful, they must include an attack on the economic aspects of these crimes. Forfeiture is the mechanism through which such an attack may be made.

S.Rep. No. 225, 98th Cong., 2d Sess. 191, *reprinted in* 1984 U.S.Code Cong. & Adm. News 3182, 3374.

Our conclusion that forfeiture under section 881 is not so punitive in either purpose or effect as to require it to be considered a criminal provision does not change when we view the purpose and effect in light of the *ex post facto* clause of the Constitution. In fact, the remedial purpose of the statute becomes even more compelling; to place beyond the statute's reach property purchased with illegal drug proceeds acquired prior to its enactment would seriously impede Congress' goal of attacking the economic power bases of criminal organizations that existed at the time the statute was passed. Conversely, refusing to apply the clause would not directly protect individuals, as opposed to property, from punishment. Because section 881 is, therefore,

in both purpose and effect primarily a remedial, civil forfeiture provision, we hold that the *ex post facto* clause of the Constitution does not apply to it. Consequently, the district court in this case properly rejected Griffin's *ex post facto* constitutional claim.

### D. *The District Court's Jury Instruction*

█ Finally, Griffin argues that the district court erred in refusing to submit to the jury an instruction Griffin requested in the consolidated action. According to Griffin, by rejecting his proffered instruction, the district court misled the jury into finding that the automobiles, gold bars, and jewelry which were the subject of the consolidated action could be forfeited by the government despite the pre-plea agreement.

"Trial courts are accorded great latitude in shaping instructions, and a verdict-based judgment will be reversed because of an erroneous instruction only when the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Mayo v. Borden, Inc.*, 784 F.2d 671, 672 (5th Cir.1986) (citations omitted). We have no such doubt in this case. The primary issue in the consolidated action was whether the government knew about the automobiles, gold bars, and jewelry at the time it entered into the pre-plea agreement with Griffin. As Judge Hoeveler explained when interpreting the plea agreement, "If, as in the case of the ranch, the government was aware of such property, then that property would fall in the same category and be subject to the same proscriptions as the ranch." Order Clarifying Plea Agreement, *United States v. Griffin*, No. 82–72–Cr at 3–4 (S.D. Fla. Dec. 6, 1985) (Hoeveler, J.). Conversely, as long as the government was ignorant of the property at the time the agreement was signed, it could forfeit the property without running afoul of the agreement. Consequently, Judge Steger instructed the jury that:

> [I]f Bruce Emery Griffin owned property which the Government did not even know about at the time they made their agreement with Griffin, they may forfeit that

property. In other words, the Government could not have promised to let Griffin keep property they did not know that he had.

*United States v. One (1) 1984 Lincoln Mark VII Two-Door*, No. S–84–148–CA, 5 Record at 410.

Griffin, however, argues that as it was intended in the pre-plea agreement, the term "knowledge" is not as narrow as Judge Steger's instruction interprets it. According to Griffin, the government had knowledge of the automobiles, gold bars, and jewelry when it signed the pre-plea agreement as long as it knew that Griffin "possessed sufficient money at that time to acquire" those properties. To support his conclusion, Griffin relies on "logic" and the fact that section 881 is a tracing statute. As Griffin explains it, "[Since] the Government claims these assets are forfeitable as 'traceable proceeds' from drug transactions, the questions [sic] of whether the Government 'knew' of these assets at the time of the pre-plea agreement must encompass that same assets-'tracing' concept." Griffin, therefore, requested an instruction which did not require the jury to find that the government actually knew of the specific assets which Griffin purchased with his money before the protection of the plea agreement was activated; instead, Griffin requested that the jury be told that knowledge of the total sum of money Griffin had available was sufficient.

As did Judge Steger, we reject Griffin's interpretation of the knowledge requirement of the agreement and, therefore, his jury instruction argument. As discussed earlier, both Griffin and the government agreed throughout the entire proceedings that Judge Hoeveler was the proper person to interpret the pre-plea agreement. Consequently, Judge Steger's role with respect to the agreement was relegated by the parties to "interpret[ing] Judge Hoeveler's decision." 630 F.Supp. at 1556. With respect to the government's knowledge, Judge Steger's conclusion that the agreement required knowledge of the actual assets sought to be forfeited is in perfect accord with the language Judge Hoeveler

chose when interpreting the agreement.[9] In contrast, the interpretation urged by Griffin is not even faintly suggested by Judge Hoeveler. Moreover, we think it disingenuous of Griffin to argue for Judge Steger's limited role of review of the plea agreement when the government stands to lose from it, and for a more expansive role when it better benefits Griffin. We therefore hold that the trial court did not err in rejecting Griffin's proffered jury instruction.

## III.

For the reasons stated above, the judgments of the district court in the related matters before us are AFFIRMED in all respects.

**9.** The Order Clarifying Plea Agreement entered by Judge Hoeveler provides:

[T]he last area about which there seems to be some uncertainty has to do with the properties which were found on the ranch in question, such as, for example, the gold bars, etc. Judge Steger in his well written order has commented on this Court's position. I would like to further clarify the point.

If, as in the case of the ranch, the Government was aware of such property, then that property would fall in the same category and be subject to the same proscriptions as the ranch. To the extent that, at the time of the

plea agreement, Government representatives were not aware of such properties, they could not have been within the contemplation of the parties, in spite of the portion of the plea agreement relating to other actions. *Thus, as to other properties not within the knowledge or contemplation of the parties and which were obtained with funds illegally obtained, assuming such properties are "legally, beneficially or equitably" owned by Mr. Griffin, such properties are subject to forfeiture.*

Order Clarifying Plea Agreement, *United States v. Griffin*, No. 82–72–Cr at 3–4 (S.D.Fla. Dec. 6, 1985) (Hoeveler, J.) (emphasis added).